# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

ALBERTO CASILLAS,

               Petitioner,

        v.

GEORGE JAIME, et al.,

               Respondents.

Case No. CV 20-2167-JEM

MEMORANDUM OPINION AND ORDER
DENYING PETITION FOR WRIT OF
HABEAS CORPUS AND DENYING
CERTIFICATE OF APPEALABILITY

## PROCEEDINGS

On March 5, 2020, Alberto Casillas ("Petitioner"), a prisoner in state custody, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. Section 2254 ("Petition"). On July 9, 2020, Warden Jaime ("Respondent") filed an Answer. On October 21, 2020, Petitioner filed a Reply.

Pursuant to 28 U.S.C. § 636(c), both parties have consented to proceed before this Magistrate Judge.

///

///

///

///

**PRIOR PROCEEDINGS**

On August 31, 2017, a Los Angeles County Superior Court jury found Petitioner guilty of kidnapping (Cal. Penal Code § 207(a)), injury to a person with whom the defendant had a dating relationship (Cal. Penal Code § 273.5(a)), and making criminal threats (Cal. Penal Code § 422(a)).  (Lodged Document ("LD") 1, Clerk's Transcript ("CT") 211-13.)  On November 22, 2017, the trial court found that Petitioner had been convicted of a serious or violent felony constituting a strike under California's Three Strikes Law and a serious felony within the meaning of Cal. Penal Code § 667(a)(1).  (CT 247-48.)  The trial court sentenced Petitioner to 16 years and four months in state prison.  (CT 248-50, 252.)

Petitioner appealed to the California Court of Appeal.  (LD 3.)  In an unpublished opinion issued on February 6, 2019, the Court of Appeal affirmed his convictions, modified the judgment to stay the sentence on the criminal threats count, and remanded the case for the trial court to exercise its discretion with respect to striking the Section 667(a) sentencing enhancement.  (LD 9 at 31.)  Petitioner filed a petition for review in the California Supreme Court, which summarily denied review on April 17, 2019.  (LD 10-11.)

On May 30, 2019, the trial court declined to strike the Section 667(a) enhancement.  (LD 12 at 24.)  After the stay of his sentence on the criminal threats count, Petitioner's sentence is 15 years.  (LD 12, 13.)

**SUMMARY OF EVIDENCE AT TRIAL**

Based on its independent review of the record, the Court adopts the following factual summary from the California Court of Appeal's unpublished opinion as a fair and accurate summary of the evidence presented at trial:

///

///

///

///

2

1

**B.     Prosecution Case**

2          Susie[1] and [Petitioner] began dating around July 2016.  They had broken

3    up prior to the incident on May 3, 2017.  At trial, Susie claimed they had gotten

4    back together; however, on the day of the incident she reported that she had

5    broken up with [Petitioner] the week before and was attempting to avoid contact

6    with him.  At the time of the incident, Susie was at the home of several members

7    of her family, including her mother and two brothers, Kenneth and Hinaro, in the

8    city of Duarte, in Los Angeles County.

9          1.     Lee Carter

10          Lee Carter, who lives across the street from Susie's family, testified that

11   on May 3, 2017, around 1:30 pm, he was outside watering his plants when he

12   saw a man "beating on" Susie who was "hollering for help."  The man was

13   "beating on her arm and on her shoulder trying to put her into a car."  Susie was

14   holding onto the door frame and resisting, but the man "beat, and beat" until

15   Susie "finally gave up" and let go of the frame.  The man then "grabbed her with

16   both arms around her, pinned both her arms so she could not resist him picking

17   her up and jamming her into the car" in the front passenger seat.  He also hit her

18   three or four times on the shoulder.  The incident lasted three or four minutes.

19          After Susie was forced into the car, the man got into the driver's seat and

20   drove away quickly.  Carter got a partial license plate from the car and called 911

21   "because I figured the young lady needed help."  From the partial plate,

22   authorities were able to get the full license plate number for [Petitioner]'s Honda.

23   At trial, Carter identified a photo of the car as the one he saw that day.

24

25

26   _____

27   [1]     The Court of Appeal referred to the victim and her family members by their first names to protect
their privacy.  The Court will do the same.

28                                                   3

Carter was about 50 feet away from the incident.  He told the police that the man was Latino, but he had never seen him before and would not be able to identify him.

The 911 call was played for the jury.  In it, Carter tells the operator that a guy "kidnapped this lady and she was hollering." He also stated she was "screaming and . . . then he just grabbed her and slammed her into the car." Later in the call, the operator asked again whether he could tell the woman was taken against her will.  Carter responded, "Oh, hell, yes."

2.    Sheriff's department witnesses

Deputy Josh Lambert of the Los Angeles Sheriff's Department (LASD) testified that he responded to the Duarte home on May 3, 2017 and spoke with Carter, the neighbor who had called 911.  Carter told him he heard a female screaming for help, went out to his porch, and "saw a female being punched in the face several times, screaming for help, screaming 'stop,' and ultimately saw her being forced into a vehicle."  Carter said the woman looked terrified. He also said the man grabbed the woman "by the back of her head by the hair and also her pants and forced her into the vehicle." FN3

> FN 3: At trial, Carter denied seeing the man strike Susie in the
> face.  He also denied seeing the man grab Susie by her hair
> or pants before forcing her into the vehicle, and said he
> never told the sheriff's deputies that.

Lambert also retrieved Susie's cell phone from Kenneth, which Susie had left behind at the Duarte home.  Kenneth told Lambert there were voicemails on the phone.  Lambert listened to the threatening voicemail message and provided the caller's number to LASD detective Robert Leyva for GPS tracking.  Leyva testified that they used the phone number provided by Lambert to get a location

4

for the caller's cell phone through the phone company.  The address provided was [Petitioner]'s residence in East Los Angeles, approximately 18 miles from Susie's family residence in Duarte.

LASD deputy Alicia Marquez arrived at [Petitioner]'s residence in East Los Angeles on May 3, 2017 in response to the call of a possible kidnapping.  She saw [Petitioner] and Susie outside his home.  She took Susie to her patrol vehicle to question her.  Susie at first was "reluctant to say anything," but then admitted she had been dating [Petitioner] and had broken up with him the week prior. Marquez asked Susie to give a written statement but Susie refused.

Susie told Marquez she had been avoiding all contact with [Petitioner], but he was "trying to get in contact with her."  On May 3, [Petitioner] called the landline at the Duarte house; Susie answered the phone but hung up when she realized it was [Petitioner].  [Petitioner] arrived at the house shortly thereafter.  He began yelling at Susie to open the front door and told her if she did not, he would kick the door in.  Susie opened the door and went outside "to avoid any further drama" and [Petitioner] blocked her from going back inside.   [Petitioner] continued to block her with his body and yelled at her to get into his car, which was parked in front of the home.  Susie repeatedly told him she did not want to go with him and yelled at him to stop.  Susie told Marquez that [Petitioner] pushed her into the car "and she got in and didn't try to get out because she was afraid of what he would do or hurt her so she stayed in the vehicle."

Marquez testified that Susie seemed "shut down" and "defeated" when talking to her, and would "just give bits and pieces and stop talking." Susie's eyes were red and swollen and looked like she had been crying, but she did not say why.  Her hair was disheveled, she had a bright red abrasion on her right shoulder and bruises on both thighs "the size of fingertips."  Marquez asked

5

Susie how she got the bruises and the shoulder injury and she said she did not know.

Sheriff's deputies arrested [Petitioner] without incident.  Marquez did not see any injuries on him.

Detective Leyva spoke with Susie in the afternoon on May 3 as he and another detective drove her back to the Duarte house. FN 4.  With traffic, the drive took close to an hour.  According to Leyva, Susie initially was reluctant to speak with him, but he began to establish a rapport with her.  Susie told him that shortly after she and [Petitioner] started dating in July of 2016, she noticed that [Petitioner] "had a very short temper, was a very controlling, a jealous type." Leyva asked if she had ever been assaulted, and she mentioned one prior incident where [Petitioner] lost his temper and slapped her.  She stated she did not report the incident because she feared that he "would do it again."

FN 4: This interview was not recorded

Susie also told Leyva that she had gone out of town prior to the May 3 incident and had returned to Los Angeles about three weeks ago.  She had not told [Petitioner] when she was leaving or when she was coming back.  While she was gone, [Petitioner] consistently called her, causing her to change her cell phone number several times.  He also called her house several times in the days before the incident, and once, Susie answered.  After [Petitioner] recognized her voice, he began a "barrage" of calls because he knew she was home.  Susie also mentioned that [Petitioner] had threatened that if she did not talk to him or see him, he was going to come to her house.

Susie told Leyva that she was upset that [Petitioner] came to the house on May 3, and she did not want to cause any issues with her other family members who were there.  Susie reported that when [Petitioner] showed up at

the house and banged on the door, she tried to wait it out, hoping he would leave. But he told her he was not going to leave and if she did not come out, he would kick the door down.  When she went out to talk to him, he began yelling profanities at her and insisted that she get in the car with him.  When she refused to get into the car, [Petitioner] grabbed her by the hair and body and forced her in.  She was afraid he would assault her so she did not get back out of the car.

Susie also told Leyva that as she and [Petitioner] were driving on the freeway in [Petitioner]'s car, her seatbelt was twisted so she manipulated the belt to try to untwist it.  As she did so, [Petitioner] told her, "if you try to get out, I'm going to kick your ass.  I'm going to choke your ass.  You're not going to get out of the car."  Susie said that she complied because she was afraid he would follow through.  When they arrived at [Petitioner]'s house, they spoke in the car, and Susie convinced [Petitioner] that she would continue with their relationship as long as he kept his cool.  Leyva testified that he did not see any indication on May 3 that Susie was under the influence of any narcotic.

3.    Kenneth and Alexis

Kenneth, Susie's brother, testified that when he arrived home on May 3, 2017 the police were already there.  He discovered Susie had left her computer open and her phone on the bed.  He looked at Susie's phone and dialed the recent number that had called her; [Petitioner] answered.  Kenneth identified himself and asked for Susie.  [Petitioner] said she would call him back.  Susie called back from a private number; Kenneth asked if she was coming back and she said, "yeah, in a bit."  She sounded like she had been crying.

Alexis R., Hinaro's girlfriend, was also at the Duarte residence that day. Alexis testified that, earlier in the day, she told Susie she was going to the gym, and  Susie  said  to  close  the  door  behind  her  "because  she  didn't  want

[[Petitioner]] to come." When Alexis returned from the gym, police officers were there.

According to Alexis, previously Susie confided that [Petitioner] was threatening her. Susie asked to show Alexis some voicemail messages [Petitioner] left, but Alexis wanted to stay out of it. At trial, the prosecution introduced a voicemail left on Susie's phone sometime prior to the date of incident. Alexis identified the caller as [Petitioner]. The message included the following: "[Y]ou think you're crazy or what? You think you can fucking quit me like that, Susie? What? Then I would be even fucking like come back. I might [unintelligible] I'm going to show you which fucking, where his head is. All right, I'm going to snatch your ass up."

Alexis spoke with Susie on the phone while Susie was with [Petitioner] during the May 3 incident. She asked if Susie was ok, and Susie said she had to go. Alexis asked if she was coming home, and Susie responded, "I'm still going to be here. I'm going to talk to him." Alexis asked where she was and Susie told her she was at [Petitioner]'s house.

4.    Susie

Susie testified that she and [Petitioner] had resumed their relationship as of May 3, 2017. She claimed that she invited [Petitioner] to the Duarte house that day. When he arrived, she came outside. She "tripped and he helped me up." When she tripped, she "probably, just, like, hit my knee somewhere." Susie testified that she voluntarily got in [Petitioner]'s car and they drove to [Petitioner]'s house. She denied any yelling by [Petitioner] on the drive. When the prosecutor showed Susie a photo from the day of the incident depicting bruising on her thighs, she said that she was anemic and the bruises were caused by carrying boxes when helping her friend move. Shown a photograph of her face, she said

her eyes were puffy because she had been talking to [Petitioner] about her children and had been crying.

Susie testified that after she and [Petitioner] arrived at his house, Kenneth and Alexis called looking for her.  They said the sheriffs had been called and asked if she was ok.  She said yes.  They also told her that someone had reported a kidnapping and the police were on their way.  She thought it was ridiculous and suggested that she and [Petitioner] wait outside so the authorities could see it was not true.  When they arrived, she told the sheriff's deputies that she was fine and [Petitioner] had not kidnapped her.

Susie admitted speaking to a female deputy (Marquez) and then a male detective (Leyva) the day of the incident.   But she denied making any incriminating statements about [Petitioner] to the law enforcement officers.  She acknowledged telling Leyva about a prior incident when a boyfriend slapped her across the face during an argument, but claimed that it was a different ex-boyfriend and suggested that Leyva "got confused."  She denied speaking to Leyva about her relationship with [Petitioner].

At the time of trial, Susie was in custody on a pending charge for felony possession of methamphetamines for sale.   She also had several prior convictions—for misdemeanor burglary in 2009, felony commercial burglary in 2013, and misdemeanor child abuse in 2012.  She testified that she was under the influence of methamphetamine on the day of the incident and that she had disclosed that fact to Marquez. FN 5

> FN 5: According to Marquez, Susie did not report that she had ingested any methamphetamine or that she tripped and fell.

The prosecutor also played the threatening voicemail for Susie and she acknowledged it was left on her phone sometime prior to the date of incident.

1  Susie testified that she could not identify the caller's voice and claimed
2  [Petitioner] had not left her any threatening messages.

3        5.    Domestic violence expert

4        Gail Pincus, executive director of the Domestic Abuse Center, testified as
5  an expert for the prosecution.  She explained generally the "cycle of violence" in
6  a domestic violence relationship, based on research done with battered women.
7  She discussed the tactics of power and control used by an abuser to keep an
8  abusive relationship going, including criticism, isolation, economic control, and
9  intimidation.  She also discussed the typical pattern of escalating levels of
10  violence over time, with the most extreme level including "use of a weapon, biting,
11  sexual assault rape, and we know that the ultimate is murder."  Pincus detailed
12  the way an abuser might move from control to violence, and then to conduct
13  aimed at "hooking the victim back in."  She then discussed the typical thoughts
14  and behaviors of the victim in response to each phase of the cycle, including
15  reporting and subsequently recanting.  She did not know any of the parties
16  involved in this case.

17  **C. Defense Case**

18        [Petitioner] did not present any affirmative evidence.

19  (LD 9 at 3-12.)

20                      **PETITIONER'S CONTENTIONS**

21        1.    The evidence was constitutionally insufficient to support Petitioner's conviction
22  for making criminal threats.  (Pet. at 5.)[2]

23        2.    Petitioner's due process rights were violated by the trial court's admission of
24  evidence regarding the profile of a domestic violence abuser.  (Id. at 5, 12-13.)

25

26

27  ――――――――――――――

28    [2]   The Court will use the page numbers assigned by the CM/ECF system.

**STANDARD OF REVIEW**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs the Court's consideration of Petitioner's cognizable federal claims. 28 U.S.C. § 2254(d), as amended by AEDPA, states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim - (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000); see also Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003) (clearly established federal law is "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision"). "[I]f a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision." White v. Woodall, 572 U.S. 415, 426 (2014) (internal quotation marks and citation omitted). If there is no Supreme Court precedent that controls a legal issue raised by a habeas petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law. Wright v. Van Patten, 552 U.S. 120, 125-26 (2008) (per curiam); see also Carey v. Musladin, 549 U.S. 70, 76-77 (2006).

A federal habeas court may grant relief under the "contrary to" clause if the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. Williams, 529 U.S. at 405-406. "The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle . . . but unreasonably applies it to the facts of a particular case." Bell v. Cone, 535 U.S. 685, 694 (2002). An unreasonable application of Supreme Court holdings "must be objectively unreasonable, not merely wrong." White, 572 U.S. at 419 (citing Andrade, 538 U.S. at 75-76; internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (citation omitted). The state court's decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 102. "If this standard is difficult to meet, that is because it was meant to be." Id.

A state court need not cite Supreme Court precedent when resolving a habeas corpus claim. See Early v. Packer, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" the state court decision will not be "contrary to" clearly established federal law. Id.

A state court's silent denial of federal claims constitutes a denial "on the merits" for purposes of federal habeas review, and the AEDPA deferential standard of review applies. Richter, 562 U.S. at 98-99. When no reasoned decision is available, the habeas petitioner has the burden of "showing there was no reasonable basis for the state court to deny relief." Id. at 98. The federal habeas court must conduct an independent review of the record to determine whether the state court decision is objectively reasonable. See Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2011); Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

1      When a reasoned decision is available, the federal habeas court "looks through" a

2  state court's unexplained decision to the last reasoned decision of a lower state court, and

3  applies the AEDPA standard to that decision.  See Wilson v. Sellers, 138 S. Ct. 1188, 1192

4  (2018) (federal habeas court should "look through" unexplained state court decision to last

5  state court decision "that does provide a relevant rationale" and "should then presume that

6  the unexplained decision adopted the same reasoning," although presumption may be

7  rebutted); Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) ("Where there has been one

8  reasoned state judgment rejecting a federal claim, later unexplained orders upholding the

9  judgment or rejecting the same claim rest upon the same ground.")

10      Petitioner presented his claims in this Petition to the state courts on direct appeal.

11  (LD 3, 10.)  The Court of Appeal denied the claims in a reasoned decision and the

12  California Supreme Court summarily denied review.  (LD 9, 11.)  The Court looks through

13  the California Supreme Court's summary denial of review to the Court of Appeal's reasoned

14  decision and applies the AEDPA standard to that decision.  See Wilson, 138 S. Ct. at 1192;

15  Ylst, 501 U.S. at 803.

16                    **DISCUSSION**

17  **I.**    **Ground One Does Not Warrant Federal Habeas Relief**

18      In Ground One, Petitioner contends that the evidence at trial was insufficient to

19  support his conviction for making criminal threats.  (Pet. at 5.)  For the reasons set forth

20  below, the Court of Appeal reasonably rejected this claim.

21      **A.**    **Applicable Federal Law**

22      The Due Process Clause of the Fourteenth Amendment guarantees that a criminal

23  defendant may be convicted only "upon proof beyond a reasonable doubt of every fact

24  necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358,

25  364 (1970).  The federal standard for assessing the constitutional sufficiency of the

26  evidence in support of a criminal conviction is set forth in Jackson v. Virginia, 443 U.S. 307

27  (1979).  Under Jackson, "the relevant question is whether, after viewing the evidence in the

28

1   light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the

2   essential elements of the crime beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 319

3   (emphasis in original); <u>see also</u> <u>Wright v. West</u>, 505 U.S. 277, 296-97 (1992) (plurality

4   opinion).  Put another way, the <u>Jackson</u> standard "looks to whether there is sufficient

5   evidence which, if credited, could support the conviction." <u>Schlup v. Delo</u>, 513 U.S. 298,

6   330 (1995).

7          The <u>Jackson</u> standard preserves the jury's responsibility to resolve conflicts in the

8   testimony, weigh the evidence, and draw inferences from basic facts.  <u>Jackson</u>, 443 U.S. at

9   319; <u>see also</u> <u>Walters v. Maass</u>, 45 F.3d 1355, 1358 (9th Cir. 1995) (reviewing court must

10  respect the exclusive province of the trier of fact to determine the credibility of witnesses,

11  resolve evidentiary conflicts, and draw reasonable inferences from proven facts).  "[U]nder

12  <u>Jackson</u>, the assessment of the credibility of witnesses is generally beyond the scope of

13  review." <u>Schlup</u>, 513 U.S. at 330.  A federal habeas court faced with a record supporting

14  conflicting inferences "must presume – even if it does not affirmatively appear in the record

15  – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer

16  to that resolution." <u>Jackson</u>, 443 U.S. at 326; <u>see also</u> <u>Wright</u>, 505 U.S. at 296-97.

17  Circumstantial evidence and reasonable inferences drawn from it may be sufficient to

18  sustain a conviction.  <u>United States v. Jackson</u>, 72 F.3d 1370, 1381 (9th Cir. 1995);

19  <u>Walters</u>, 45 F.3d at 1358.  Ultimately, "it is the responsibility of the jury – not the court – to

20  decide what conclusions should be drawn from evidence admitted at trial." <u>Cavazos v.</u>

21  <u>Smith</u>, 565 U.S. 1, 2 (2011) (per curiam).

22         Although sufficiency of the evidence review is grounded in the Fourteenth

23  Amendment, the federal court must refer to the substantive elements of the criminal offense

24  as defined by state law and must look to state law to determine what evidence is necessary

25  to convict on the crime charged.  <u>See</u> <u>Jackson</u>, 443 U.S. at 324 n.16; <u>Juan H. v. Allen</u>, 408

26  F.3d 1262, 1275 (9th Cir. 2005).  However, "the minimum amount of evidence that the Due

27

28

1  Process Clause requires to prove the offense is purely a matter of federal law."  Coleman v.

2  Johnson, 566 U.S. 650, 655 (2012).

3      Under AEDPA, the federal habeas court's inquiry is "even more limited"; the court

4  "ask[s] only whether the state court's decision was contrary to or reflected an unreasonable

5  application of Jackson to the facts of a particular case."  Emery v. Clark, 643 F.3d 1210,

6  1213-14 (9th Cir. 2011); see also Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011)

7  (where Jackson claim is "subject to the strictures of AEDPA, there is a double dose of

8  deference that can rarely be surmounted"); Juan H., 408 F.3d at 1274 (under AEDPA

9  federal courts must "apply the standards of Jackson with an additional layer of deference).

10      **B.  Applicable California Law**

11      The crime of making criminal threats in violation of Cal. Penal Code § 422 requires

12  the prosecution to prove five elements.  People v. Toledo, 26 Cal.4th 221, 227 (2001).  The

13  California Supreme Court has explained:

14      [T]he prosecution must establish all of the following: (1) that the defendant

15      "willfully threaten[ed] to commit a crime which will result in death or great

16      bodily injury to another person," (2) that the defendant made the threat "with

17      the specific intent that the statement . . . is to be taken as a threat, even if

18      there is no intent of actually carrying it out," (3) that the threat—which may be

19      "made verbally, in writing, or by means of an electronic communication

20      device"—was "on its face and under the circumstances in which it [was] made,

21      . . . so unequivocal, unconditional, immediate, and specific as to convey to the

22      person threatened, a gravity of purpose and an immediate prospect of

23      execution of the threat," (4) that the threat actually caused the person

24      threatened "to be in sustained fear for his or her own safety or for his or her

25      immediate family's safety," and (5) that the threatened person's fear was

26      "reasonabl[e]" under the circumstances.

27  Id. at 227-28 (citations omitted).

28

### C.    Court of Appeal's Opinion

Petitioner argued on appeal that the evidence did not support "two of the elements of the charge—that the threat must be unequivocal, unconditional, and immediate, and must cause sustained fear." (LD 9 at 13.) The Court of Appeal rejected both contentions. With respect to the "unequivocal, unconditional, and immediate" element, it stated:

> [Petitioner] threatened that he would kick and choke Susie if she tried to get out of the car. There was evidence that he made this threat immediately upon observing Susie adjusting her seatbelt, and following a struggle in which he forcibly put her into the car after she resisted. This was sufficient evidence to establish that the threat was both unambiguous and immediate.

(Id. at 14.)

The Court of Appeal explained that "the fact that the threat was conditional [did] not, alone, place it outside the scope of section 422." (Id.) Threats often have some aspect of conditionality, and courts must look to the effect on the victim and the degree to which the victim understands that the threat will be carried out if the condition is not met. (Id. at 14-15.) The Court of Appeal concluded that in this instance "the definition was met, given Susie's prior statements indicating her fear of [Petitioner] and her belief he would carry out his threats, coupled with evidence of the prior history of [Petitioner]'s temper, violence, and threats towards Susie." (Id. at 15.) The Court of Appeal also rejected Petitioner's argument that the threat could not have been carried out because Susie would not have attempted to exit the car on the freeway. (Id.) There was evidence from which the jury could have found that the traffic was moving slowly enough that Susie could have tried to exit, and that she complied with the threat because she was afraid. (Id.)

With respect to the "sustained fear" element, the Court of Appeal stated:

> [Petitioner] claims there is no evidence that Susie's fear lasted beyond the moment he told her he would "kick [her] ass" and "choke [her] ass" if she tried to get out of the car. This ignores the evidence of all of the circumstances

surrounding [Petitioner]'s threat.  Susie told Leyva that she stayed in the car after [Petitioner] threatened her because she was scared he would follow through on the threat.  She did not attempt to exit the car at any point on the 18-mile ride with [Petitioner], nor did she do so once they arrived at his house until she had convinced [Petitioner] they could stay together.  Moreover, although Susie recanted her statements at trial, there was evidence by several other witnesses that she had told them she was afraid of [Petitioner], that he had made prior threatening statements to her, and had struck her on a prior occasion, which she did not report because she feared he would do it again. Under those circumstances, there was sufficient evidence for the jury to conclude that [Petitioner]'s threat induced a reasonable fear in Susie that was more than fleeting, and kept her from trying to leave the car for a sustained period of time.

(Id. at 17.)

### D.   Analysis

Petitioner contends that there was insufficient evidence of sustained fear to support his conviction for making criminal threats because "[t]he victim and the testifying officer never said for how long she was afraid."  (Pet. at 5; see also Reply at 3.)

"Sustained fear" requires fear for "a period of time that extends beyond what is momentary, fleeting, or transitory," but "no minimum time period is required."  People v. Allen, 33 Cal. App. 4th 1149, 1156 & n.6 (1995) (15 minutes was "more than sufficient" for sustained fear); see also People v. Fierro, 180 Cal. App. 4th 1342, 1349 (2010) (sufficient evidence of sustained fear where victim testified that defendant's threats caused him fear for the minute or so that defendant exposed what victim believed was a gun and for up to 15 minutes after victim drove away).

Detective Leyva testified that Susie told him that when Petitioner saw her adjusting her seatbelt, he said, "If you try to get out, I'm going to kick your ass.  I'm going to choke

your ass.  You're not going to get out of the car."  (LD 2, 2 Reporter's Transcript ("RT")

1242-43.)  Susie was afraid that Petitioner would follow through and did not try to get out of

the car at any time during the 18-mile drive.  (2 RT 1235 [18 miles], 1243.)  Deputy Marquez

testified that Susie said she did not try to get out of the car because she was afraid that

Petitioner would hurt her.  (2 RT 1207.)  In addition, Susie told Detective Leyva that on an

earlier occasion Petitioner had slapped her when he lost his temper, and she did not report

the incident to the police because she was afraid he would do it again.  (2 RT 1239.)  Susie

told her brother's girlfriend that Petitioner had left her threatening voicemail messages.  (2

RT 1220-23.)  Under California law, "[t]he victim's knowledge of defendant's prior conduct is

relevant in establishing that the victim was in a state of sustained fear."  Allen, 33 Cal App.

4th at 1156.  Viewed in the light most favorable to the prosecution, this evidence was

sufficient to enable a rational jury to find the element of sustained fear.  See Jackson, 443

U.S. at 319.

Petitioner further contends that there was insufficient evidence that the threat would

be carried out because it was "conditioned on the victim jumping out of the car and it is too

impractical to believe that she would do so."  (Pet. at 5.)  The mere fact that Petitioner's

threat was couched as a conditional statement did not necessarily mean that it was not

"unconditional" for purposes of Section 422.  "Rather, it is necessary to review the language

and context of the threat to determine if the speaker had the specific intent that the

statement was to be taken as a threat."  People v. Dias, 52 Cal. App. 4th 46, 52 (1997)

(citation omitted).  "A seemingly conditional threat contingent on an act highly likely to occur

may convey to the victim a gravity of purpose and immediate prospect of execution," as

required by Section 422.  Id. (citation omitted).

Petitioner threatened to kick and choke Susie if she tried to get out of the car.  He

made the threat while Susie was adjusting her seatbelt and he might reasonably have

thought that she was about to undo it preparatory to jumping out of the car.  (2 RT 1243-44.)

Susie told Deputy Marquez that she did not try to get out because she was afraid that

1  Petitioner would hurt her.  (2 RT 1207.)  Although Petitioner argues that Susie would not

2  jump out of a moving car, a rational jury could have inferred from Detective Leyva's

3  testimony that the 18-mile drive from Petitioner's house to Susie's home took nearly an hour

4  (2 RT 1235, 1238) that when Petitioner was driving Susie, his car was sometimes moving

5  very slowly or was stopped, so that Susie might try to get out, at least when the car was on a

6  surface street.  It is not for the Court to assess the likelihood that Susie would actually try to

7  do so; a on a sufficiency of the evidence review the Court must assume that the jury drew all

8  reasonable inferences in favor of the verdict.  See McDaniel v. Brown, 558 U.S. 120, 133

9  (2010) (evidence that defendant washed his clothes immediately upon returning home

10  supported inference that he did so to remove bloodstains; even though defendant provided

11  alternative reason for washing clothes, reviewing court was obliged to draw inference

12  supporting verdict); see also Coleman, 566 U.S. at 655 ("Jackson leaves juries broad

13  discretion in deciding what inferences to draw from the evidence presented at trial, requiring

14  only that jurors 'draw reasonable inferences from basic facts to ultimate facts'" (quoting

15  Jackson, 443 U.S. at 319)).

16          Under Jackson, "[a] reviewing court may set aside the jury's verdict on the ground of

17  insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos,

18  565 U.S. at 2; see also Coleman, 566 U.S. at 656 ("The jury in this case was convinced, and

19  the only question under Jackson is whether that finding was so insupportable as to fall below

20  the threshold of bare rationality.")  The Court of Appeal's determination that the jury's verdict

21  passed muster under this highly deferential standard was not objectively unreasonable.

22          Accordingly, the Court of Appeal's rejection of this claim was not contrary to, or an

23  unreasonable application of, clearly established federal law as set forth by the United States

24  Supreme Court.  Ground One does not warrant federal habeas relief.

25  **II.**     **Ground Two Does Not Warrant Federal Habeas Relief**

26          In Ground Two, Petitioner contends that his due process rights were violated by the

27  admission of expert testimony concerning the profile of a domestic violence abuser.  (Pet. at

28

1  5, 12-13.)  For the reasons set forth below, the Court of Appeal reasonably rejected this

2  claim.

3  **A.    Background**

4       Before trial, the trial court held a hearing regarding proposed testimony by Gail

5  Pincus, the prosecution's domestic violence expert, under California Evidence Code

6  Sections 801 and 1107.[3]  (2 RT 18.)  The prosecutor represented that she expected the

7  victim to recant, and Pincus's testimony would assist the jury in understanding the cycle of

8  violence in domestic violence cases and why domestic violence victims tend to recant.  (2 RT

9  18.)  Trial counsel objected that Pincus's testimony would be irrelevant and prejudicial,

10  because in other trials Pincus had testified at length about how a batterer typically acts

11  instead of focusing on why the victim might recant.  (2 RT 18-20.)  The trial court tentatively

12  ruled that the testimony was relevant, but allowed the parties to revisit the issue during trial.

13  (2 RT 20.)

14       The trial court held another hearing on the issue before Pincus testified.  (2 RT 971.)

15  Trial counsel requested the trial court to limit Pincus's testimony "to the beliefs and behaviors

16  of complaining witnesses" and why a victim would recant, and to exclude evidence about the

17  cycle of violence, a batterer profile, or how a batterer acts.  (2 RT 971-972.)  Trial counsel

18  also requested a limiting instruction to be given before Pincus testified.  (2 RT 971, 973.)

19  The trial court denied the request to limit the evidence, but told trial counsel that she could

20  make specific objections if Pincus's testimony went beyond the scope of Section 1107.  (2

21

22       [3]    Section 801(a) permits the introduction of expert testimony that would "assist the trier of fact."

23  Cal. Evid. Code § 801(a).  Section 1107(a) provides:

24       In a criminal action, expert testimony is admissible by either the prosecution or the
        defense regarding intimate partner battering and its effects, including the nature and

25       effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior
        of victims of domestic violence, except when offered against a criminal defendant to

26       prove the occurrence of the act or acts of abuse which form the basis of the criminal
        charge.

27

28  Cal. Evid. Code § 1107(a).

RT 972-73.)  It stated that it might give a limiting instruction, but only at the jury instruction stage.  (2 RT 973.)

While Pincus was testifying, the trial court sustained a defense objection to her testimony regarding an abuser's tendency to use pornography and ordered that testimony stricken.  (2 RT 980.)  It overruled another objection by defense counsel as to scope.  (2 RT 982.)

At the conclusion of the trial, the trial court instructed the jury:

Gail Pincus's testimony about battered women's syndrome is not evidence that

the defendant committed any of the crimes charged against him.  You may

consider this evidence only in deciding whether or not Susie R.'s conduct was

not inconsistent with the conduct of someone who has been abused, and in

evaluating the believability of her testimony.

(2 RT 1512.)

**B.     Court of Appeal's Opinion**

The Court of Appeal held that the trial court properly admitted Pincus's expert testimony regarding intimate partner battering.  (LD 9 at 21-26.)  It noted that there was no requirement that Petitioner match all of the characteristics of a typical abuser in order for this testimony to be relevant and admissible.  (Id. at 21.)  Under California law, "[e]vidence regarding the cycle of violence in a domestic violence relationship is admissible when there is 'some independent evidence of domestic violence' in the relationship."  (Id. (citing People v. Brown, 33 Cal.4th 892, 908 (2004)).  The Court of Appeal stated:

[Petitioner]'s argument ignores all of the evidence supporting the existence of a

domestic violence relationship between [Petitioner] and Susie.  There was

evidence that [Petitioner] struck Susie on at least one prior occasion, and that

she was afraid of him; and there was testimony from multiple witnesses

regarding [Petitioner]'s physical violence toward Susie on the day of the

incident.  Susie reported that [Petitioner] was controlling and had a bad temper;

1      there was additional evidence of [Petitioner]'s controlling and angry conduct in

2      the voicemail message left by [Petitioner] and the testimony that he would

3      repeatedly call Susie, threaten her, and appear at her home in an intimidating

4      manner after she had broken up with him.  This evidence was more than

5      sufficient to establish the presence of domestic violence in the relationship

6      between [Petitioner] and Susie.  Accordingly, the expert testimony regarding

7      the cycle of violence was relevant to the crucial issue of Susie's credibility and

8      the reasons she might recant her prior statements.

9  (LD 9 at 22.)

10      The Court of Appeal rejected Petitioner's challenge to the scope of the testimony.  (Id.

11  at 23.)  It agreed with the trial court's reasoning that "the testimony regarding a typical abuser

12  was a necessary part of understanding the victim's responses to that abuse, and therefore

13  part of the relevant discussion of the cycle of violence."  (Id. at 23.)  It noted that the trial

14  court left the door open for trial counsel to make specific objections to portions of the

15  testimony she felt exceeded the scope of Section 1107.  (Id. at 24.)

16      Finally, the Court of Appeal found that Pincus's testimony did not constitute improper

17  profile evidence.  Pincus "testified generally regarding typical behavior patterns in domestic

18  violence relationships and was not asked to opine using hypotheticals matching the facts of

19  this case."  (Id. at 25.)  She acknowledged that she did not know the facts of the case and

20  she offered no opinions about them.  (Id.)  In her closing statement, the prosecutor focused

21  on how Pincus's testimony helped to explain Susie's actions and did not use the testimony to

22  argue that Petitioner fit the profile of an abuser.  (Id.)  In addition, the trial court gave a

23  limiting instruction.  (Id. at 25-26.)

24      For the same reasons, the Court of Appeal "reject[ed] [Petitioner]'s assertion that the

25  expert testimony violated his due process rights and rendered the trial fundamentally unfair."

26  (Id. at 26 n.7.)

27

28

**C.    Applicable Federal Law**

"The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (internal quotation marks and citation omitted). "A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005). Evidence introduced by the prosecution will often raise more than one inference, some permissible and some not, and it is up to the jury to sort them out in light of the trial court's instructions. Id. (citing Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991)). "Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must be of such quality as necessarily prevents a fair trial." Jammal, 926 F.2d at 920 (internal quotation marks, emphasis, and citation omitted).

When an evidentiary error claim is governed by the Section 2254(d)(1) standard, federal habeas review is even more restricted. The Ninth Circuit has explained that "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." Holley, 568 F.3d at 1101. "The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process," and "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." Id.; see also Greel v. Martel, 472 F. App'x 503, 504 (9th Cir. 2012) ("There is . . . no clearly established federal law that admitting prejudicial evidence violates due process.")

**D.    Analysis**

Petitioner contends that the admission of Pincus's testimony about the profile of an abuser violated due process because it was "inflammatory, irrelevant, and improper 'profile evidence.'" (Pet. at 5, 12-13.)

1   　　　To the extent that Petitioner contends that some of Pincus's testimony was improperly

2   admitted under California evidentiary law, his claim fails because habeas corpus will not lie

3   to correct errors in the interpretation or application of state law.  See Estelle v. McGuire, 502

4   U.S. 62, 67 (1991) ("it is not the province of a federal habeas court to reexamine state-court

5   determinations on state-law questions"); Lewis v. Jeffers, 497 U.S. 764, 780 (1990) ("federal

6   habeas corpus relief does not lie for errors of state law"); Langford v. Day, 110 F.3d 1380,

7   1389 (9th Cir. 1996) (habeas petitioner may not "transform a state-law issue into a federal

8   one merely by asserting a violation of due process").

9   　　　As for the constitutional claim, Petitioner has not identified any Supreme Court

10  authority that clearly establishes that the admission of inflammatory, irrelevant, and improper

11  profile evidence violates due process.  In fact, the Supreme Court has not clearly held that

12  the admission of irrelevant or overtly prejudicial evidence violates due process so as to

13  warrant habeas relief.  Holley, 568 F.3d at 1101.  The Court of Appeal cannot have

14  unreasonably applied clearly established federal law if none exists.  See Van Patten, 552

15  U.S. at 125-26.

16  　　　Moreover, even apart from the AEDPA issue, Petitioner has not shown that the

17  admission of Pincus's testimony rendered his trial fundamentally unfair.  See Holley, 568

18  F.3d at 1101.  Pincus's testimony regarding the profile of a batterer was probative of Susie's

19  credibility, because it helped explain why Susie recanted her statements to the police and

20  testified favorably to Petitioner at trial.  See Morales v. Sexton, No. CV 17-04179-R (DFM),

21  2018 WL 5291914, at *5 (C.D. Cal. Aug. 17, 2018) (jury could draw permissible inferences

22  from expert testimony regarding intimate partner battering because evidence was relevant to

23  assess victim's credibility "and understand why she recanted and denied the abuse

24  altogether"), accepted by 2018 WL 5292054 (C.D. Cal. Oct. 22, 2018).  When there are

25  permissible inferences the jury can draw from the evidence, its admission at trial does not

26  violate due process.  Jammal, 926 F.2d at 920; see also McElvain v. Lewis, 283 F. Supp. 2d

27  1104, 1127 (C.D. Cal. 2003) ("Since there were permissible inferences that could be drawn

28

from the expert witness's testimony regarding the battered women's syndrome, even if the evidence had been improperly admitted, which it was not, its admission did not prevent a fair trial.")

Petitioner cites <u>United States v. Wells</u>, 879 F.3d 900, 920-23 (9th Cir. 2018), in which the Ninth Circuit expressed reservations about profiling evidence and reversed a federal conviction when the jury was allowed to use expert profiling testimony as substantive evidence of guilt.  (Reply at 8.)  Petitioner's jury was not allowed to use Pincus's testimony as substantive evidence of guilt.  The jury was instructed with CALCRIM No. 850 that it could not use Pincus's testimony as evidence that Petitioner had committed the charged crimes, but could only use it to determine whether Susie was credible and whether she acted as an abused person.  (2 RT 1512; CT 199.)  The jury is presumed to follow its instructions.  <u>See</u> <u>Weeks v. Angelone</u>, 528 U.S. 225, 234 (2000); <u>Richardson v. Marsh</u>, 481 U.S. 200, 211 (1987).

Petitioner maintains that he is not challenging Pincus's testimony to the extent it pertained to Susie's credibility, but is only challenging inflammatory and irrelevant statements that suggested to the jury that if he were not convicted, he would go on to rape or murder Susie or another woman.  (Reply at 8-9.)  Petitioner is referring to Pincus's testimony that the level of violence in a domestic violence relationship typically escalates, "with the most extreme level including use of a weapon, biting, sexual assault, rape, and we know that the ultimate is murder."  (2 RT 983.)  This brief reference to rape and murder was part of a lengthy exposition by Pincus that spanned several pages without interruption.  (<u>See</u> 2 RT 983-91.)  The prosecutor never referred to it in her closing statement.  In fact, the prosecutor used Pincus's testimony solely to explain why Susie was able to tell the officers what happened immediately after the incident, but after she returned to Petitioner she recanted and started minimizing his actions.  (2 RT 1523-25, 1538-39.)

1    Petitioner argues that the jury's question about his criminal record shows that the jury

2  was considering whether he fit the profile of an abuser.[4]  (Reply at 10.)  The jury's question is

3  wholly insufficient to rebut the presumption that Petitioner's jury followed its instructions

4  regarding permissible uses of Pincus's testimony.  See Richardson, 481 U.S. at 208 (jurors

5  are presumed to follow instruction to "disregard an incriminating inference" unless there

6  exists "overwhelming probability of their inability to do so").

7    Accordingly, the Court of Appeal's rejection of this claim was not contrary to, or an

8  unreasonable application of, clearly established federal law as set forth by the United States

9  Supreme Court.  Ground Two does not warrant federal habeas relief.

10                     **CERTIFICATE OF APPEALABILITY**

11    Pursuant to Rule 11 of the Rules Governing Section 2254 cases, the Court "must

12  issue or deny a certificate of appealability when it enters a final order adverse to the

13  applicant."  For the reasons stated above, the Court concludes that Petitioner has not made

14  a substantial showing of the denial of a constitutional right, as is required to support the

15  issuance of a certificate of appealability.  See 28 U.S.C. § 2253(c)(2).

16                              **ORDER**

17    IT IS ORDERED that: (1) the Petition is denied; (2) Judgment shall be entered

18  dismissing this action with prejudice; and (3) a certificate of appealability is denied.

19

20  DATED: March 25, 2021                    _/s/ John E. McDermott_
                                              JOHN E. MCDERMOTT
21                                      UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26

---

27       [4]    The jury asked whether the prosecution had access to Petitioner's criminal record and whether
    it could have presented it as evidence.  (CT 210; 2 RT 1801.)  The trial court responded, "Whether the
28  defendant has a prior criminal record is not relevant nor evidence."  (2 RT 1802.)